UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



-------------------------------------------------------------x

STEPHEN P. FINKELSTEIN,                          :

                 Petitioner,                     :

        -against-                            :          Case No.: 11-CV-

                            :

UBS GLOBAL ASSET                                 :          ECF Case
MANAGEMENT (US), INC. and                        :
UBS SECURITIES LLC,                              :

                Respondents.                  :

-------------------------------------------------------------x

## PETITON TO VACATE ARBITRATION AWARD

### Relief Sought

    The Petitioner, Stephen P. Finkelstein, though his undersigned counsel, petitions this Court for an order vacating in part a FINRA arbitration award, delivered to the parties on October 20, 2010 (the "Award"), in the case captioned Stephen P. Finkelstein v. UBS Global Asset Management (US), Inc. and UBS Securities LLC, FINRA DR No. 08-04888. Specifically, Finkelstein requests that the Court vacate so much of the Award that denied his claim for a "special payment" of $6,374,500 under the Respondents' ERISA governed severance pay plan, on grounds that: (a) the denial of the claim for a "special payment" was in "manifest disregard of the law;" (b) because the Award was procured through the fraudulent concealment of material information by the Respondents, see 9 U.S.C. §10(a)(1); and (c) because the arbitration refused to hear evidence pertinent and material to the controversy. See 9 U.S.C. §10(a)(3). Finkelstein also seeks discovery in connection with this Petition pursuant to 9 U.S.C. § 1 et seq. and Fed. R. Civ. P. 81(a)(6)(B).

### Parties

    1.    Petitioner Stephen P. Finkelstein ("Finkelstein") is an individual who resides in New York City, New York.

2.      Respondent UBS Global Asset Management (US), Inc. ("UBS GAM") is a Delaware corporation with its principal place of business located at 800 Harbor Road, 1st Floor, Weehawken, NJ 07086. UBS GAM's ultimate parent is UBS AG.

3.      Respondent UBS Securities LLC ("UBS") is a Delaware corporation with its principal place of business located at 677 Washington Blvd., Stamford, CT 06901. UBS's ultimate parent is UBS AG.

### Jurisdiction

4.      This Court has jurisdiction over this Petition pursuant to the provisions of 28 U.S.C. § 1331 on grounds that the Award was rendered in manifest disregard of federal law (specifically, The Employee Retirement Income Security Act of 1974, as amended (ERISA)).  Alternatively, this Court has jurisdiction over this matter pursuant to the provisions of 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the parties and more than $75,000, exclusive of interest or costs, is at stake.

5.      This petition is timely because it has been made within three months of the date on which the Award was delivered to the parties.

### Venue

6.      Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C.1391, in that Finkelstein worked for UBS and UBS GAM in New York City, New York; the events at issue in the underlying arbitration case took place in New York City, New York; and the arbitration hearing was held and the Award was made and issued in New York City, New York.

## Facts

### Finkelstein Joins UBS GAM's Alternative Investment Business in 2006

7.      Finkelstein joined UBS as an employee in 2002.  In 2006, he was named an employee of Dillon Read Capital Management (DRCM), a newly formed alternative investment management business within UBS GAM, working as a portfolio manager with responsibility for a variety of subprime securities. DRCM had been formed in mid-2005, and managed over $3.5 billion of UBS AG's assets as well as "outside" funds raised by DRCM from non-UBS investors. DRCM was effectively a hedge fund.

### UBS AG Closes DRCM in May 2007 and DRCM Terminates Finkelstein

8.      Although DRCM was highly profitable for 2005 and 2006, earning over $2 billion for its investors (i.e., UBS AG and outside investors), UBS AG announced the closure of DRCM on May 3, 2007 due to losses as of March 31, 2007 totaling $150 million involving subprime securities within DRCM.

9.      Finkelstein's employment with UBS GAM terminated in August 2007, although his trading authority was suspended in mid-March 2007 due to unrealized "losses" in the subprime securities he was managing.

### UBS GAM's ERISA Governed Severance Pay Program

10.      As part of the closure of DRCM, UBS GAM adopted a "Separation Program" (the "Program") and a "Supplemental Program for Certain Employees of Dillon Read Capital Management" (the "Supplemental Program") that provided that "eligible" employees would be paid, among other benefits, severance pay based on length of service and a "special payment," which Respondents determined would be an amount equal to 25% an eligible employee's 2006 bonus. The Program specified that it was an ERISA covered plan.

11.      The Program provided that it would be implemented by a committee. Under the

Program, that committee was authorized to "delegate to any one or more of its own members or to UBS Global Asset Management's employees any responsibility it may have under the Program. The committee shall make the rules and regulations necessary to administer the Program. The committee, or its delegate, as the case may be, has the discretionary authority and responsibility to determine eligibility for benefits and the amount of such benefits, and to construe the terms of the Program. The determinations and constructions of the committee or its delegate will be final, binding and conclusive as to all parties, unless found by a court of competent jurisdiction to be arbitrary and capricious."

12.     The Program provided further that "Any denial of a claim will be provided in writing and will include: (1) the reasons for the denial (including reference to the pertinent Program provisions on which the denial is based); (2) if applicable, a description of any additional material or information necessary for the claimant to complete the claim, and an explanation of why such material or information is necessary; and (3) the claims review procedure."

13.     The Program stated that "[t]he committee's, or its delegate's decision on claims shall be final, binding and conclusive on all interested parties unless found by a court of competent jurisdiction to be arbitrary and capricious."

14.     The Program specified also that "In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Program. The people who operate the Program, called "fiduciaries" of the Program, have a duty to do so prudently and in the interest of you [i.e., the beneficiary of the Program (in this case Finkelstein was the beneficiary of the Program)] and the other Program participants and beneficiaries. ... If your claim for severance benefits is denied in whole or in part you must receive a written explanation of the reason for the denial.  You have the right to have the

4

Program review and reconsider your claim."

15.     The Respondents formed a "Severance Committee" that was charged with reviewing and reconsidering claims for, inter alia, the "special payment," in accordance with the provisions of the Program.

16.     The Supplemental Program provided that "DRCM Management" could determine whether an employee was eligible for benefits, and the amount of the benefit.

17.     The sole written eligibility requirements for an employee to be paid the "special payment" under the Supplemental Program were that he: (1) must have been terminated from DRCM between May 3 and September 30, 2007 as a direct result of DRCM's reintegration into UBS and (2) must not have been terminated for some other reason, such as unsatisfactory performance.

18.     If an employee was deemed eligible for benefits under the Supplemental Program, then Section C of the Supplemental Program, titled "What benefit am I eligible to receive under the Supplemental Program if I satisfy its eligibility requirements?", provided that an employee "may" be entitled to a "special payment" which would be determined at management's discretion.

19.     The undisputed testimony at the hearing was that Respondents determined that Finkelstein had met the eligibility requirements (under Section B) of the Supplemental Program.

20.     The Supplemental Program does not define the formula for determining the "special payment."

21.     Suneel Kamlani ("Kamlani"), who in 2007 served as Chief of Staff to the CEO of UBS and the Chairman of the DRCM Integration Committee (although he was never an employee of DRCM), whose function was to reintegrate DRCM's operations into UBS, testified at the arbitration hearing that the "special payment" was an "ex gratia payment," or a "bonus" as

5

that term is defined in the United Kingdom. According to Kamlani, this "ex gratia payment" was a pro-rated bonus for 2007, based on a formula that equaled 25% of the employee's 2006 bonus.

22.    Maria Bliss, a UBS GAM human resources executive who advised the Severance Committee, also confirmed that the "special payment" equaled 25% of an employee's 2006 bonus.

23.    Kamlani testified that the purpose of the "ex gratia payment" was threefold: (1) to make sure that staff was retained to manage the firm's risks; (2) address hostility within DRCM's staff about UBS's decision to reintegrate the DRCM business on account of losses at DRCM, even though the losses were limited to the ABS business; and (3) a desire to have employees leave on a friendly basis because they would potentially become clients of the firm. Kamlani.

24.    Ramesh Singh ("Singh") was a UBS employee who assisted in the reintegration of DRCM into UBS (and acted as interim Chief Investment officer for DRCM) and also, along with Kamlani, had fiduciary responsibility under the Program and Supplemental Program.

25.    Singh, who had nothing to do with creating the Program or Supplemental Program in any respect, testified at the hearing that the "special payment" was intended to compensate DRCM employees who were being terminated "for their general contributions."

26.    Neither Kamlani nor Singh were ever employed by UBS GAM or DRCM.

**Finkelstein is Denied a "Special Payment"**

27.    Kamlani testified that a recommendation was made to deny "special payments" to individuals responsible for the "most significant losses" at DRCM, including Finkelstein, although (a) he did not recall who made that recommendation, (b) how it came about, and that (c) he did not believe that he was involved in making the recommendation that Finkelstein not get the "special payment."

28.     Singh claimed at the hearing that he was one of the individuals who made the decision to deny a "special payment" to Finkelstein.

29.     Kiku Taura, the Regional Head of Human Resources for UBS GAM and a member of the Severance Committee, testified, however, it was both Kamlani and Singh who made the decision to deny Finkelstein the "special payment." By contrast, Respondents took the position in their response to one of Finkelstein's Information Requests at the arbitration hearing (request no. 6) that Bliss, along with Kamlani and Singh, were part of "DRCM Management" that determined that Finkelstein was not entitled to a "special payment." Bliss, however, testified that she participated in only one discussion with Singh about Finkelstein (in which in-house UBS Securities counsel Rebecca White also participated), and during that meeting she [i.e., Bliss] said nothing about Finkelstein.

30.     To confuse matters even further, in contrast to Kamlani's testimony that he did not believe he was involved in denying the "special payment" to Finkelstein, Jordan Schiffman ("Schiffman"), who served as both an in-house employment/litigation attorney for UBS and also provided advice to the Program's fiduciaries, including the members of the Severance Committee, testified that Kamlani and Singh exercised "DRCM Management's" discretion in determining that individuals who had "substantial losses" would not be eligible for the "special payment;" that this determination was made "roughly around the time [Supplemental Program] was adopted" (on or around May 1, 2007) and that he had no recollection if this "substantial losses" "standard" was written down anywhere, but testified that it was definitely **_not_** included in writing in the Program or the Supplemental Program.

31.     On May 17, 2007, Singh and Bliss sent Finkelstein a letter placing him on paid administrative leave.

32.     In a letter dated June 26, 2007 from Singh and Bliss to Finkelstein, they advised

7

him that his employment was terminating on August 25, 2007 and that among other things he would be entitled to receive a lump sum payment of 39 weeks of salary under the Program and the Supplemental Program if he signed a release.   The June 26 letter did not mention or specify why he was being denied the "special payment," even though the Program expressly required that UBS GAM advise him in writing of "the reasons for the denial (including reference to the pertinent Program provisions on which the denial is based)."

33.    Finkelstein filed his first appeal to the Severance Committee from the denial of his "special payment" on July 16, 2007.

**The Severance Committee Receives Conflicted Advice**

34.    On July 2, 2007, the Severance Committee (which consisted of Taura, Mario Cueni (General Counsel of UBS GAM) and Tim Hargreaves (a UBS GAM human resources officer based in the UK)) met with Proskauer Rose LLP attorneys Lloyd Chinn, Adam Lupion and Joseph Baumgartner; UBS attorneys Schiffman and Rebecca White; and DRCM's General Counsel Lou Eber, to discuss employee claims under the Program and Supplemental Program. David Aufhauser, Global General Counsel of the UBS AG investment bank, also participated by phone for part of the meeting.

35.    Cueni testified at the hearing that the Severance Committee received advice from both Schiffman and White "about what kind of approach was taken in connection with consistency."

**The Severance Committee's Meetings**

36.    The Severance Committee met in person on August 8, 2007 and by phone on December 21, 2007 and February 25, 2008.

**The August 8 Severance Committee Meeting**

37.    At the August 8 meeting (also scheduled to attend that meeting was

8

"Proskauer"), the Severance Committee supposedly accepted "management's" decision to deny Finkelstein's "special payment" (according to notes from the meeting) on the basis that "management decisions not to award based on magnitude of loss was a appropriate exercise of management discretion." At that meeting, Taura was provided with a packet of information about Finkelstein, but she did not read the information.

38. According to Cueni, the Severance Committee received all of its information from Schiffman, Bliss and Eber. Cueni testified that he assumed, but was not certain, that Schiffman had spoken with Singh and Kamlani about Finkelstein. According to Cueni, it was Schiffman's job to have collected the facts, interviewed the relevant people and investigated on behalf of the Severance Committee. Cueni was aware that Finkelstein had been paid a $25 million bonus for 2006 shortly before the losses appeared at DRCM.

39. Taura, who testified that she did not "have much knowledge of what the DRCM business was except in general terms," never spoke or communicated with Kamlani or Singh about Finkelstein. Taura was unaware of the process by which "management" decided to deny Finkelstein the "special payment." She testified that nobody at the August 8 meeting ever told the Severance Committee that "management" had exercised discretion. She also testified to a total lack of recollection of any discussion at the August 8 meeting concerning the process by which "management" supposedly exercised its discretion; and she never talked to management about its alleged exercise of discretion. She also had no knowledge of what information was available to "management" when it allegedly exercised its discretion.

40. Cueni testified that nobody on the Severance Committee spoke with Kamlani or Singh.

41. Taura testified that as an ERISA fiduciary she understood that she had an obligation to "make sure that information was obtained and reviewed fairly in respect of these

kind of reviews." She admitted, however, that she directly did nothing to make any effort to "obtain information from management to review the Finkelstein situation." She also was fairly certain that Hargreaves had not done anything, either, and was unaware of what, if anything, Cueni had done.

42.     Cueni admitted that he was told that his role on the Severance Committee was as an ERISA fiduciary. It was his understanding that it was the Severance Committee's role was to ensure that the plan's rules were applied consistently.

**The Severance Committee Denies Finkelstein's First Appeal**

43.     The Severance Committee did not notify Finkelstein of its August 8 denial of his appeal until October 12, 2007.

44.     On November 1, 2007, Finkelstein filed an appeal (to the same Severance Committee) from the Severance Committee's October 12, 2007 determination. The thrust of his appeal was that the profitability (P&L) of his trading positions had improved over the course of the year.

**The Severance Committee's December 21, 2007 Meeting**

45.     The Severance Committee met for a second time on December 21, 2007. At that meeting, when considering Finkelstein's second appeal, even though it had sent him a letter on October 12 (that Schiffman had authored) denying his first appeal on grounds that management had appropriately exercised discretion, the Severance Committee nonetheless discussed the fact that it had no idea how "DRCM Management" had allegedly exercised its discretion in denying to Finkelstein the "special payment."

46.     In Taura's notes from the December 21 meeting, she wrote "How Ramesh arrived at the 3 names." Her testimony at the hearing was that somebody on the Severance Committee wanted to know how Singh decided to deny "special payments" for three DRCM employees

(John Niblo, Finkelstein and Shingmin Lai). Taura also testified that she had no recollection if the Severance Committee ever received a response to the question of how Singh arrived at the three names.

47.     On December 26, the Severance Committee advised Finkelstein that it was going to take an additional 60 days to resolve his second appeal.

## "DRCM Management's" More Favorable Treatment of Gary Haviv

48.     According to Taura, the Severance Committee recognized at the December 21 meeting that another DRCM portfolio manager, Gary Haviv ("Haviv"), had received a "special payment," even though his trading losses were $20-30 million. Respondents admitted that by the end of 2007, Haviv had hundreds of millions of losses.  Taura's notes implied that his losses were at the $20-30 million level by the end of April 2007, although the record was not 100% clear on when this level of losses was reached.

## The Severance Committee Denies Finkelstein's Second Appeal

49.     On February 25, 2008, the Severance Committee met for a third and final time and discussed Finkelstein and the P&L of his trading positions.  The Severance Committee's notes from that meeting reflect that it requested P&L information for Finkelstein.  The notes do not reflect that the Severance Committee made any final determination at that meeting.

50.     However, the Severance Committee never met again. Taura testified that there were no Severance Committee meetings except those for which she had notes, and there were no notes for any Severance Committee meeting after February 25, 2008.

51.     On February 28, 2008, a P&L report regarding Finkelstein's trading positions for 2007 was provided by a back-office employee Helen Jacubovics and emailed to the members of the Severance Committee.  Taura did not read Jacubovics' email and does not recall discussing it with the other members of the Severance Committee.

52.     On February 29, 2008, Schiffman prepared a letter on behalf of the Severance Committee, which denied Finkelstein's second appeal, claiming that the Severance Committee had reviewed Finkelstein's year-end trading positions and still concluded that he had trading losses. If anyone conducted this review and came to this conclusion, it was Schiffman, who was not a member of the Severance Committee.

53.     Taura testified that she had no idea what was being referred to as "losses" in the February 29 letter that Schiffman had prepared and which she co-signed with Hargreaves.

54.     Cueni testified that even assuming Finkelstein's trading book had been profitable at the end of 2007, the Severance Committee still would not have granted him a "special payment" and that the entire exercise of getting to information on Finkelstein year-end 2007 P&L was simply a means to test the assumptions set forth in Finkelstein's appeal.

55.     Under the Program and Supplemental Program, Finkelstein was entitled to a "special payment" of $6,374,500. In 2006 Finkelstein was responsible for generating over $325 million in trading profits for DRCM, and was paid a formulaic bonus in excess of $25.5 million for his performance that year.

56.     Although Finkelstein's mark-to-market P&L (i.e., unrealized) on his trading positions showed losses of approximately $300 million by April 30, 2007, between that date and December 31, 2007, even by Respondents' calculations offered at the arbitration hearing, Finkelstein's trades in that eight month period made a $245 million profit. (Respondents claimed that even taking into account the $245 million in profits from April 30-December 31, 2007, Finkelstein's total trading P&L for 2007 still showed a loss of around $100 million.)

57.     Respondents' calculations, however, vastly understated Finkelstein's actual profitability for 2007, because (a) they were loaded up with almost $60 million of fictional loss "reserves" under a new policy allegedly adopted at year-end 2007, (b) charged him $70-75 million of losses incurred by another trader (Shingmin Lai) in subprime securities called Terwin bonds (losses which Finkelstein's superior Ken Karl told him he would not be held accountable for), (c) omitted close to $100 million of "carry" (i.e., interest) profits and (d) failed to account for realized profits on trades that were closed out before the end of the year.

58.     By Finkelstein's own calculation, his trading positions were substantially profitable when examined on a year-end 2007 basis, taking into account the items referenced in the preceding paragraph.

**The FINRA Arbitration**

59.     On December 19, 2008, Finkelstein filed a Statement of Claim with FINRA Dispute Resolution, in which he sought an award granting him, among other things, the "special payment" in accordance with Section 502(a) of ERISA.

60.     UBS and UBS GAM filed an Answer to the Statement of Claim, dated February 24, 2009.

61.     After the parties conducting pre-hearing discovery, arbitration hearings were held before a three-member arbitration panel in New York City on December 8, 11, 15, 16 and 17, 2009, and May 12, 13,14, 25, 26 and 27, July 1, August 13 and 26, 2010.

62.     During discovery, Finkelstein sought documentation concerning the marks/prices at which UBS marked the same securities that he traded at DRCM, on the belief that UBS marked those securities higher than where he marked his securities. This would have established that his mark-to-market unrealized "losses" were not as great as claimed by Respondents at the hearing. The arbitration panel denied this request for discovery.

63.     The parties each submitted post-hearing briefs to the arbitration panel on the ERISA claim, along with copies of the cases cited in the briefs.

64.     FINRA delivered the arbitration panel's Award to the parties on October 20, 2010.

65.     The Award, which contained no explanation or rationale, granted Finkelstein compensatory damages of $112,500, plus interest, but otherwise denied all of his other claims, including the claim for the "special payment." The amount awarded represented salary due Finkelstein under the terms of the UBS GAM severance pay plan.

### Claims by Finkelstein

**FIRST CLAIM**
**The Award was in Manifest Disregard of the Law**

66.     The arbitration panel in its Award manifestly disregarded the law (specifically ERISA) by failing to award Finkelstein the "special payment."

67.     The Award was in manifest disregard of the law (see T. Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 340 (2d Cir. 2010)) because:

a.     UBS and UBS GAM failed to implement the Program and Supplemental Severance Program as written. Respondents imposed, unlawfully, an unwritten eligibility requirement on the Severance Plan (see Smith v. Dunham-Bush, Inc., 959 F.2d 6, 10 (2d Cir. 1992)(holding that ERISA prohibits oral modifications to benefit plans that disadvantage a beneficiary of the plan)) that allegedly provided that individuals with "substantial losses" as of April 30, 2007 were not entitled to be paid a "special payment." This condition was not memorialized in writing. It was allegedly based on this condition that Finkelstein was denied a "special payment." Despite being advised of the governing law prohibiting oral modifications to ERISA plans, the arbitration panel knowingly and wrongfully enforced the Program and

Supplemental Program as if it incorporated this unwritten eligibility requirement, which worked to Finkelstein's detriment, in complete derogation of Finkelstein's rights under ERISA (*see* McCauley v. First Unum Life, 551 F.3d 126, 132-133 (2d Cir. 2008).

   b. UBS and UBS GAM treated at least one individual similarly situated to Finkelstein differently (i.e., Gary Haviv), and allowed him to be paid a "special payment," in spite of him having incurred "substantial losses" of $20-$30 million.  Finkelstein believes that Haviv's losses were at least at this level at the time the Respondents made the decision to grant him the "special payment."  UBS claimed at the hearing that Haviv's losses were only $1-2 million at the end of April 2007, while conceding that his losses ballooned into the hundreds of millions by year-end 2007. Finkelstein believes that Singh asked Haviv at the end of April 2007 to re-mark his positions, which were showing this $20-30 million loss during the course of the month, to eliminate most of the losses. Whereas Haviv's losses increased throughout 2007, Finkelstein's trading positions became increasingly more profitable during the year.  The arbitration panel, which was aware of the applicable law, nonetheless permitted this unequal treatment of similarly situated individuals in denying the "special payment" to Finkelstein, in complete derogation of Finkelstein's rights under ERISA (*see* West v. Nexpress Solutions, Inc., 2008 WL 365930, * 4 (W.D.N.Y., February 1, 2008).

   c. UBS GAM's "Severance Committee," which was required by ERISA to conduct its own full and independent review of the denial of the "special payment" (*see* Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 234, 2349 (2008)), instead abdicated its fiduciary obligations and did nothing at all and/or ceded all decision-making authority to UBS, though a conflicted attorney employed as in-house counsel for UBS, in total violation of its fiduciary responsibilities to make determinations "with an eye single to the interests of the participants and beneficiaries." John Blair Telecommunications, Inc. Profit Sharing Plan v. Telemundo Group,

Inc. Profit Sharing Plan, 26 F.3d 360, 368 (2d Cir. 1994); Cress v. Wilson, 2007 WL 1686687, *

4 (S.D.N.Y. 2007).  The arbitration panel, which was aware of the applicable law, nonetheless

affirmed the denial of the "special payment" due Finkelstein, in spite of the fact that

Finkelstein's rights to a full and fair review of his claim to the "special payment" under ERISA

were violated by the very fiduciaries who were required to protect his interests. Had the

Severance Committee conducted a full and fair review, rather than just serving as a "rubber

stamp" for whatever UBS wanted, it would have concluded that Finkelstein was profitable by

year-end 2007.  Moreover, the arbitration panel itself should have reviewed Finkelstein's claim

de novo and determined that he was entitled to a "special payment" on grounds that he was

wrongfully denied that payment and deprived of his rights under the Program and Supplemental

program, including his rights to a full and fair review of his claims.

## SECOND CLAIM
### The Award was Procured Through Fraudulent Concealment

68.     The Award was procured through the fraudulent concealment of material

information and should be vacated on this basis. See 9 U.S.C. §§10(a)(1).

69.     Specifically, Respondents concealed from the arbitration panel and Petitioner

during the underlying hearing that Haviv had incurred losses that were substantially greater than

the $20-30 million level by the end of June 2007, which was when DRCM advised employees of

what benefits they would be offered under the Severance Plan.     This fact only came to

Petitioner's counsel's attention when UBS disclosed it in discovery in late 2010 during the

course of discovery in another case involving another DRCM portfolio manager.  Had such

information been disclosed during the course of the underlying arbitration, it clearly would have

been material to Finkelstein's claim that he was treated in a disparate manner and it would have

had a material impact on the arbitration panel's Award.

70.     Moreover, based on the fact that Taura's notes reflected $20-$30 million in losses for Haviv, and based on losses that apparently existed in the securities Haviv traded by the end of June 2007, it would appear that Respondents concealed from Petitioner and the arbitration panel in the arbitration hearing the true level of Haviv's losses as of April 30, 2007 and that the $1-2 million of losses that Respondents claimed he had at the time vastly understated his actual losses. Had the true level of Haviv's losses throughout the relevant time period been disclosed by Respondents to the arbitration panel and Finkelstein, it would have been clear that there was no justification for denying a "special payment" to Finkelstein.

71.     Finkelstein believes that the daily P&L reports that were distributed to himself and others reflect the true extent of Haviv's losses (which he believes were much greater than $1-2 million as of April 30) and his own trading positions, and he requests discovery of, among other things, the actual daily P&L reports reflecting the P&L for all DRCM traders/portfolio managers (including himself and Haviv) for each trading day from January 1, 2007 through December 31, 2007. He also requests leave to depose such witnesses who are able to testify to the actual level of Haviv's losses at various points throughout 2007, including but not limited to April 30, 2007.

**THIRD CLAIM**
**The Arbitration Panel Refused to Hear Pertinent and Material Information**

72.     The arbitration panel refused to hear evidence pertinent and material to the controversy and the Award should be vacated on this basis. *See* 9 U.S.C. §10(a)(3).

73.     Specifically, during discovery, in his second request for information dated March 10, 2009, Finkelstein requested the following documents: "For every position/cusip that both Stephen Finkelstein and the UBS dealer desk owned, documents reflecting the prices that both Stephen Finkelstein and the UBS dealer desk had on those positions/cusips on April 30, 2007

and December 31, 2007."

74.    Finkelstein requested this discovery on the belief that UBS dealer desks held the same positions (i.e. securities) that he held, and marked those positions higher, thereby negating Respondents' contention that Finkelstein's trading activities sustained "substantial losses" at or near the level that Respondents claimed existed.

75.    The Respondents objected to producing these documents and the arbitration panel denied Finkelstein's request for the production of these documents.

76.    This information was material to Finkelstein's claims because it would have been relevant to his argument that his "losses" were not as large as Respondents represented.

77.    The arbitration panel's refusal to allow Finkelstein access to this information prejudiced Finkelstein's rights and the Award should be vacated.

78.    Finkelstein also requests that he be granted discovery of the information denied to him by the arbitration panel (i.e., the discovery sought in paragraph 73, above), and depositions of individuals who can testify concerning the same information.

## Prayer for Relief

Finkelstein requests that the Court grant his petition and vacate so much of the Award that denied his claim for a "special payment" under the governing ERISA severance pay plan on grounds that the Award was in manifest disregard of the law, and/or that the award was procured though fraudulent concealment of material information, and/or that the arbitration panel refused to hear evidence pertinent and material to the controversy; that the Court allow him to conduct discovery under the provisions of Title 9 of the United States Code and Fed. R. Civ. P. 81(a)(6)(B); and that he be awarded costs, expenses and such other relief as the Court deems just and proper.

Dated: New York, New York
      January 18, 2011

                         Respectfully Submitted,

                         LIDDLE & ROBINSON, L.L.P.

By: _____

                         Jeffrey L. Liddle
                         Ethan A. Brecher
                         Sherry M. Shore
                         800 Third Avenue
                         New York, NY 10022
                         212-687-8500
                         Attorneys for Petitioner
                         jliddle@liddlrobinson.com
                         ebrecher@liddlerobinson.com